**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Larry Lee SIMS, Defendant–Appellant.**

**No. 88–3045.**

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 11, 1989.

Decided Feb. 1, 1990.

David Thomas, Legal Services Center, Chicago, Ill., for defendant-appellant.

John McKenzie, Office of the U.S. Atty., Rockford, Ill., for plaintiff-appellee.

Before BAUER, Chief Judge, and FLAUM and MANION, Circuit Judges.

BAUER, Chief Judge.

On January 13, 1988, the grand jury returned a two-count indictment against John

Sherman, Ira Lustig, Nathan Williams and appellant Larry Sims. Count One charged each defendant with conspiracy to defraud a bank in violation of 18 U.S.C. §§ 2, 656, 1344 and 2113(b). Count Two charged each defendant with aiding and abetting an attempt to commit wire fraud against a bank in violation of 18 U.S.C. §§ 2 and 1344. After a jury trial, Sims, who was tried together with Lustig, was acquitted of Count One and found guilty of Count Two. This is Sims' appeal.

Sims first claims that there was insufficient evidence to establish that he acted with specific intent to defraud a bank. Second, he claims that the jury was improperly instructed on specific intent. We affirm Sims' conviction.

## I.

The mad scheme which forms the factual basis of this appeal stretched from one end of the country to the other. It apparently began in Chicago, where, on May 22, 1986, James Martin, a Federal Bureau of Investigation ("FBI") Special Agent acting in an undercover role, was introduced to John Sherman. Sherman stated that he wanted to wire between fifty and two hundred *million* dollars to Panama or Europe and asked for Martin's help. Martin later introduced Sherman to FBI Special Agent Roy Lane, who posed as a banker from LaSalle National Bank. Sherman originally proposed to wire $200 million into the LaSalle Bank; Lane then would wire the money out of the country and lose the documentation tying the two transactions together. Sherman later changed his mind and proposed that Lane embezzle funds from an existing commercial account, wire the money to a California bank and, of course, conceal the theft.

On the other side of the country, in Los Angeles, arrangements were being made to receive $150 million in wired funds. In August 1986, Scott Revell and Larry Sims, partners in a bookstore who were looking for investors, were introduced by Sims' nephew to Richard Crisan, Sherman's associate on the west coast. Crisan claimed to be a big-time drug dealer and said he had

$150 million "on the wire." He and Sherman were looking for someone to launder it. After the meeting Sims told Revell that Crisan was "nuts." Revell told Sims not to "bury" the idea and that there might be something that they could do to make money.

Believing drug money was involved, Revell called Drug Enforcement Administration ("DEA") Special Agent John McCaskill and told him about the meeting. Beginning in 1982, Revell had worked as a government informant for various law enforcement agencies. McCaskill told Revell to arrange for a meeting. Revell said that he did not want anything to happen to Sims, because he was using Sims to put the deal together.

Revell asked Sims to set up a meeting with Crisan, adding that he had met with "his people." Sims refused, saying that Crisan was "trouble." Revell told Sims that he was "covered" and "protected" and they could probably make some money. Revell did not explain how they could make money nor did he tell Sims that "his people" were federal agents or that he was acting as a government informant. Despite this, Sims, who was aware that Revell had worked as a government informant sometime in the past, later testified at trial that he understood Revell was working as an informant in this case and that he was to assist Revell in that effort.

Sims arranged a meeting with Crisan for September 8. Present were Special Agents McCaskill and Ralph Lochridge, posing as money launderers, along with Revell, Crisan and Sims. Revell did not inform Sims that McCaskill and Lochridge were federal agents and Sims did not learn this fact until after he was arrested. During the meeting, Crisan said that his boss in Chicago, John Sherman, wanted someone to open a business bank account in Los Angeles to receive $150 million stolen from a bank. Crisan offered a ten percent commission for the agents' help.

The next meeting took place on September 19. Although Crisan had earlier called McCaskill to tell him that he could be reached at Sims' number and that he was

with Sims twenty-four hours a day, Crisan was not at this meeting. Sims told McCaskill and Lochridge that Sherman had fired Crisan. Sims then introduced Nathan Williams who was Sherman's new representative. Williams stated that the money had been stolen and that the agents needed to open a bank account. Revell was not present at this meeting.

On October 29, during a telephone conversation with McCaskill, Sims stated that Crisan was untrustworthy and that McCaskill should watch himself. Sims also said that although he did not fully understand the plan, there was a lot of money for everyone to make.

The October 31 meeting included Sherman, who flew to Los Angeles from Chicago. Sherman met with Ira Lustig, Williams, Sims, McCaskill and Lochridge. Revell was not there. Sherman went over the plan again, asking the agents to set up a bank account. Sherman stated that he and Lustig had pulled off a similar theft in Chicago in the past. During the meeting, Sims and McCaskill left briefly. McCaskill said that he was hesitant to set up the account because he did not want law enforcement officials looking at other accounts of his "company." Sims agreed, but assured McCaskill that there would not be any problems. McCaskill and Sims had two more conversations later the same day about setting up an offshore corporation.

The group met again on November 3. Revell joined them this time. McCaskill asked for $5000 to pay the "corrupt banker" who had helped him set up the offshore corporation which he and Sims had discussed. Despite the high finance nature of the scheme, Sherman did not want to pay $5000. Instead he offered the use of an Illinois corporation that he and Lustig had set up. Lochridge then asked for certain corporate documents so that he could establish a bank account for Sherman's company. The following day the group met again, minus Revell, so that Sherman, Lustig and Lochridge could sign the signature cards and wire transfer agreements. When the agents said they needed $100 to open the account, Sims gave Lochridge the money. Revell had given Sims between $150 and $200 earlier that day to cover Sims' expenses. Revell did not tell Sims that this money had come from the government.

Sherman returned to Chicago and met with Agents Martin and Lane. He told them to transfer the funds to an account at the Security Pacific National Bank in Los Angeles. No funds were ever transferred.

On January 5, 1987, McCaskill called Sims, who had kept in contact with Sherman and Williams. Sims stated that although he did not know exactly how he was going to get paid for his role, there was money to be made. Sims said he would "come up with answers" about how they were to be paid.

On January 13, 1988, the grand jury returned a two count indictment against Sims, Williams, Sherman and Lustig. Williams pleaded guilty to both counts prior to trial. Sherman, the mastermind of the scheme, was found incompetent to stand trial and the case against him was continued. Sims and Lustig were tried together. The jury found Lustig guilty of both counts and Sims guilty of Count Two. Sims moved for a judgment of acquittal, claiming that the government failed to prove intent to defraud, and for a new trial based upon the district court's failure to give his tendered jury instructions.

The district court sentenced Sims to one year imprisonment but suspended execution of the sentence. The court placed him on probation for five years and ordered him to perform 300 hours of community service. Sims then filed a timely notice of appeal.

## II.

On appeal, Sims argues that the government presented insufficient evidence to prove beyond a reasonable doubt his intent to defraud, an essential element of the crime of aiding and abetting a bank fraud. Sims' defense at trial was that he believed in good faith that he was assisting a government informant and so did not have the requisite intent to defraud. The jury

did not believe him. Sims shoulders a heavy burden to obtain reversal on a "sufficiency" issue, especially when it turns upon the jury's credibility determination. An appellate court will uphold a conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original).

The jury found Sims to be an incredible witness. There is ample evidence to support that conclusion. Sims claimed he knew all along that Revell was acting as an informant in *this* scheme. Revell testified that he never told Sims this information and furthermore, that McCaskill instructed him not to tell Sims. Sims claimed that Revell told him they could make some *reward* money off this scheme, yet Revell testified that he said they could make *some* money in this scheme. Sims stated that he interpreted Revell's "people" to mean the police, but Revell never told him who "his people" were nor did he tell him that the "money launderers" were really federal agents. Sims did not learn otherwise until after he was arrested.

Furthermore, Sims' actions were inconsistent with his purported belief that he was aiding Revell. He conducted several telephone conversations with the "money launderers" outside the presence of Revell. He attended meetings without Revell. Yet there is no evidence that he ever told Revell about the substance of these phone calls or meetings and to pass on the information to the police or federal agents.

Sims' other actions, such as setting up the meeting with Crisan and attending meetings with Revell, could have been consistent with an intent to assist a government informant or with an intent to defraud. Once the jury chose to discount Sims' testimony, however, these other actions supported the government's case against Sims. We find, therefore, that there was sufficient evidence to convict Sims of aiding and abetting a bank fraud.

Sims' second argument on appeal is that the district court improperly instructed the jury on the issue of intent and therefore, the jury could have convicted him if it found that he "deceived the other conspirators regarding (his) role in this affair." In assessing Sims' claim, the instructions as a whole must be considered. *United States v. Grier,* 866 F.2d 908, 932 (7th Cir.1989). "As long as the instructions treat the issues fairly and adequately, they will not be interfered with on appeal." *United States v. Machi,* 811 F.2d 991, 1005 (7th Cir.1987) (*quoting United States v. Patrick,* 542 F.2d 381, 389 (7th Cir.1976)).

Sims wanted the following instruction given: "To establish specific intent, the government must prove that the defendant[ ] knowingly did an act which the law forbids, purposely intending to violate the law." Although the district court did not give this instruction, the instructions given more than adequately covered the points made by Sims' instruction. The jury was instructed that it must find beyond a reasonable doubt:

(1) that the defendant ... knowingly attempted to execute a scheme to obtain money or funds owned by or under the custody and control of a bank by means of false and fraudulent pretenses, representations and promises, as described in the indictment;

(2) that the defendant ... acted willfully and with specific intent to defraud the bank; and

(3) that at the time the bank had its deposits insured by the Federal Deposit Insurance Corporation.

It was also instructed that:

To act with "intent to defraud" means to act willfully and with the specific intent to deceive to cheat, ordinarily for the purpose of either causing some financial loss to another, or bringing about some financial gain to oneself.

The last instruction given to the jury stated:

Any person who knowingly aids, abets, counsels, commands, induces or procures the commission of a crime is guilty of

**330**

that crime. However, that person must also try to make it succeed as a criminal venture.

We find the district court adequately instructed the jury and Sims' argument that the jury could have convicted him for intending to defraud his co-conspirators rather than for intending to defraud a bank to be without merit.

### III.

Larry Sims' conviction is therefore AFFIRMED.