UNITED STATES of America,
Plaintiff–Appellee,

v.

Jerome HOWARD, Defendant–Appellant.

No. 93–2658.

United States Court of Appeals,
Seventh Circuit.

Argued April 1, 1994.

Decided July 26, 1994.

Robert Lee Garrison (argued), Office of the U.S. Atty., Crim. Div., Fairview Heights, IL, for U.S.

Andrea L. Smith (argued), Office of the Federal Public Defender, East St. Louis, IL, for defendant-appellant.

Before BAUER, FLAUM, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Jerome Howard was the owner of a small ice cream/sandwich shop known as Mr. Penguin's Malt Shop located in East St. Louis, Illinois. After a flood damaged the malt shop in 1986, Howard applied for a disaster assistance loan from the United States Small Business Administration ("SBA"). The SBA loaned Howard a total of $12,500. Howard pledged the assets of the malt shop—the building housing the malt shop and its contents—as security for the loan. Howard further agreed to maintain hazard insurance on the building and its contents and to name the SBA as loss payee of the policy.[1]

Howard contacted insurance broker Ralph Thomas who arranged for Howard to purchase, *inter alia*, fire insurance from the Scottsdale Insurance Company. That policy provided $20,000 insurance coverage for the building itself and $10,000 insurance coverage for the building's contents. The insurance policy named Beverly Bush[2] and the SBA as loss payees. That policy was effective from June 11, 1987 through June 11, 1988. Howard subsequently allowed the policy to lapse, but purchased a new fire insurance policy from the Monticello Insurance Company in 1989. He increased the amount of insurance coverage for the contents of the building to $20,000. The amount of insurance coverage for the building itself remained at $20,000. Bush and the SBA were named as loss payees for the building itself. However, Howard instructed Thomas to drop the SBA as loss payee for the contents portion of the policy. In June 1990, the building containing Mr. Penguin's Malt Shop and its contents were destroyed by fire. Howard thereafter submitted a fire damage claim to Monticello.

---

1. Howard's loan agreement with the SBA provided in pertinent part:

   *DUTY TO MAINTAIN INSURANCE*
   Prior to disbursement of Loan funds in excess of $5,000.00, Borrower will purchase hazard insurance, including fire, lightning, and extended coverage equal to 80% of the insurable value of the collateral or the minimum coinsurance requirement set forth in the insurance policy provided by the Borrower, whichever is greater, or such other amounts and types of coverage as SBA may require. Borrower will provide proof of such hazard insurance coverage to SBA together with an endorsement naming SBA as mortgagee or loss payee, and Borrower will maintain such coverage throughout the entire term of this Loan.

2. Beverly Bush and Howard entered into a contract in 1984 whereby Howard agreed to pay $20,000 plus 13% interest to purchase the building housing the malt shop. Under the terms of the contract, Howard was required to maintain liability and property damage insurance on the building at all times.

In October 1990, Thomas received two checks from Monticello as payment for the fire damage claim. The first check was made payable to Howard, d/b/a Mr. Penguin Malt Shop, and Golub & Associates[3] in the amount of $19,500.[4] This check was for fire loss to the contents of the building. Thomas forwarded this check to Golub & Associates. Ace Hart, an employee of Golub & Associates, accompanied Howard to the Motor Coach Employee's Credit Union, endorsed the check, and received payment of $3,900 for Golub's services. Howard then deposited the $19,500 check into his personal credit union account.

The second check was made payable to Howard, d/b/a Mr. Penguin Malt Shop, Beverly Bush, the SBA, and Golub & Associates. This check covered fire loss to the building itself. Thomas also forwarded this check to Golub & Associates. Hart endorsed the second check and gave it to Howard. Pearson Bush, Beverly Bush's attorney, subsequently contacted Howard and asked Howard to forward the check to him so that Ms. Bush would be certain to receive enough insurance proceeds to cover the $15,000 Howard still owed her on the purchase price of the building. Pearson Bush received the check from Howard approximately thirty days before it became stale.[5] Bush then entered into negotiations with the SBA concerning the amount of insurance proceeds the SBA expected to receive. The SBA agreed to accept $200, with Ms. Bush receiving the remaining balance of $19,300. By the time this agreement was reached, however, the check had become stale and Pearson Bush returned it to Monticello.

Thereafter, Monticello issued a replacement check and again sent it to Thomas. Howard picked up the check from Thomas's office and signed a receipt acknowledging that he had received the check. The check was made payable to the same parties as before. Howard subsequently deposited $18,000 of the check into his personal savings account at Boatmen's National Bank of Belleville and received $1,500 in cash. The check was endorsed by Howard on behalf of Mr. Penguin Malt Shop, Beverly Bush, Sue Thomas on behalf of the SBA, and A.R. Hart on behalf of Golub & Associates. The check also contained stamped endorsements of the SBA and Golub & Associates. All of the endorsements, except Howard's, were forged.

Howard was charged in a two count indictment with bank fraud and conversion of government property in violation of 18 U.S.C. § 1344 and 18 U.S.C. § 641, respectively. The government alleged that Howard forged the endorsements on the replacement check and deposited it into his own account in violation of the bank fraud statute (Count One). The government also alleged that Howard illegally converted government property by dropping the SBA as loss payee from the insurance policy and depositing the insurance proceeds representing the building's contents into his personal credit union account (Count Two). The jury found Howard guilty on both counts. The district court sentenced him to ten months imprisonment on each count, his sentences to run concurrently. The court further sentenced Howard to three years supervised release following his discharge from prison and ordered him to pay a special assessment of $100 and restitution in the amount of $19,500 to the SBA. Howard now appeals.

*Discussion*

*COUNT I*

Howard initially argues that there was insufficient evidence to convict him of bank fraud.[6] Specifically, he contends that the

---

**3.** Howard hired Golub & Associates to establish the value of the building and its contents and to determine the amount of loss caused by the fire. Golub & Associates determined that the fire was a total loss.

**4.** The policy had a deductible of $500, hence the check was for $19,500, not $20,000.

**5.** Like many checks, this check could only be cashed within ninety days of being issued.

**6.** Under 18 U.S.C. § 1344, "whoever knowingly executes, or attempts to execute, a scheme or artifice—(1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises; shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both."

government failed to prove beyond a reasonable doubt that he acted with specific intent to defraud, a necessary element of the crime of bank fraud. *See United States v. Sims,* 895 F.2d 326, 328 (7th Cir.1990) (recognizing that intent to defraud is an essential element of bank fraud).

Howard has an uphill battle. We will uphold a challenge to the sufficiency of the evidence if, " 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Id.* at 329 (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original)).

■ ■ Howard notes that there was no direct evidence presented at trial establishing that he deposited the check "knowing and believing that the signatures and stamps on it were forged." However, "[b]ecause direct evidence of a defendant's fraudulent intent is typically not available, specific intent to defraud may be established by circumstantial evidence...." *United States v. LeDonne,* 21 F.3d 1418, 1426 (7th Cir.1994). Here, the prosecution presented ample circumstantial evidence from which the jury could have reasonably inferred that Howard presented the check to the bank knowing that the endorsements were forged.

The government presented uncontroverted evidence that Howard picked up the replacement check from Thomas's office, signed for it, and deposited $18,000 of it into his personal savings account at Boatmen's National Bank of Belleville.

A total of fifteen witnesses testified in the government's case in chief. Their testimony revealed the following: Daino Jerome of the SBA's Inspector General's Office interviewed Howard and asked him how he had obtained the forged SBA endorsement. According to Jerome, Howard indicated that he had talked to Sue Thomas of the SBA's St. Louis district office and she told him to send the check to her and that she would "take care" of all the endorsements except Howard's. Howard indicated that he got the check back from Ms. Thomas with all the necessary endorsements except his own.

Kim Rogers, an SBA employee, stated that no Sue Thomas has ever worked for the SBA's St. Louis office. SBA employee Darryl Westbrook also said that no Sue Thomas worked for the SBA's St. Louis office. Moreover, the SBA does not use an endorsement stamp like the one used to endorse the replacement check.

Pearson Bush, Beverly Bush's attorney, contacted Howard shortly after he learned that Monticello had issued the replacement check. According to Pearson Bush, Howard told him that he had sent the check to the SBA's Denver, Colorado office. Raymond Baca of the SBA's Denver office said, however, that his office never received the check.

The signature of Ace Hart, Vice President of Golub & Associates, had been forged and the ᵣstamped Golub & Associates endorsement was also a forgery. Beverly Bush never endorsed the check and her purported signature was also a fake.

Handwriting expert William Storer testified that the signatures of Beverly Bush and Ace Hart were forgeries. Storer could not, however, determine whether Howard had committed those forgeries.

Given the uncontroverted evidence that Howard picked up the replacement check, deposited it into his own personal savings account, and told conflicting stories as to how he acquired the forged endorsements, a rational jury could have found beyond a reasonable doubt that Howard deposited the check knowing that the endorsements were forged. We therefore affirm Howard's conviction for bank fraud.

*COUNT II*

■ Next, Howard challenges his conviction for converting government property in violation of 18 U.S.C. § 641. The prosecution proved at trial that Howard failed to name the SBA as loss payee for the contents portion of the fire insurance policy as required under the terms of his loan agreement with the SBA. The prosecution also proved that Howard deposited the insurance check representing the fire damage to the building's contents into his own personal savings account. Howard argues, however, that his

conviction should be reversed because neither the insurance check or its proceeds are "a thing of value of the United States."

Under 18 U.S.C. § 641, "[w]hoever embezzles, steals, purloins, or knowingly converts to his own use or the use of another, or without authority, sells, ... any record, voucher, money, or thing of value of the United States ... [s]hall be fined not more than $10,000 or imprisoned not more than ten years, or both...." There are three elements to the crime of conversion under section 641: "(1) that the money or property belonged to the government; (2) that the defendant fraudulently appropriated the money or property to his own use or the use of others; (3) and that the defendant did so knowingly and willfully with the intent either temporarily or permanently to deprive the owner of the use of the money or property." *United States v. McRee*, 7 F.3d 976, 980 (11th Cir.1993) (en banc), *cert. denied sub nom. Hale v. United States*, — U.S. —, 114 S.Ct. 1649, 128 L.Ed.2d 368 (1994).

▪ The only element of the crime in dispute is whether the insurance check or its proceeds belonged to the United States. "It is axiomatic that conversion must involve the property of *another*, not the property of the defendant." *United States v. Kristofic*, 847 F.2d 1295, 1297 (7th Cir.1988) (citation omitted) (emphasis in original). In its brief, the government argues that the United States had a perfected security interest in the proceeds of the insurance check. The government's position is supported by Illinois law.

In *Kindred v. Boalbey*, 73 Ill.App.3d 37, 29 Ill.Dec. 77, 391 N.E.2d 236 (1979), Francis L. Kindred entered into an installment contract with Richard M. Boalbey for the sale of a residence and the land on which the residence was located. Pursuant to the contract, Boalbey agreed to "keep all buildings at any time on said premises insured against loss by fire and extended coverage ... to the full insurable value...." *Id.* 29 Ill.Dec. at 79, 391 N.E.2d at 238. Boalbey purchased an appropriate insurance policy and the residence was subsequently damaged by fire. The insurance company issued a fire loss check naming Kindred and Boalbey as co-payees. A dispute arose between the parties

as to who was entitled to the insurance proceeds. The state trial court determined that Boalbey could retain all the insurance proceeds. The Illinois Appellate Court reversed, holding that Kindred had a security interest in the insurance proceeds "to the extent of the unpaid purchase price due and owing" her. *Id.* 29 Ill.Dec. at 80, 391 N.E.2d at 239.

Similarly, we believe that the SBA retained a security interest in the insurance proceeds at issue here. Like the *Kindred* case, Howard agreed to maintain insurance on the contents of the building in which the malt shop was located. Moreover, the insurance requirement served the same purpose in both cases—to protect a lienholder's interest in property. The only difference between this case and *Kindred* is that Howard entered into such an agreement pursuant to a loan agreement, not a real estate contract. This difference is not significant, however, because it is nature of the insurance maintenance provision and not the type of the overall agreement that controls. Accordingly, we conclude that the SBA had a security interest in the proceeds of the fire loss check.

▪ That does not end our inquiry, however, because Howard contends that the SBA's mere security interest in the insurance proceeds is not a "thing of value of the United States." In support of his contention, Howard cites us to *United States v. Tana*, 618 F.Supp. 1393 (S.D.N.Y.1985). In that case, Tana and his associates had received $1 million in loans from the United States Department of Commerce, Economic Development Administration ("EDA") for the operation of a business—Yonkers Plate Glass, Inc. and its subsidiary Fedentrol, Inc. (Collectively "YPG"). YPG had agreed to pledge all of its assets as security for the EDA loans. Thereafter, Tana stole many of YPG's assets and used them to start a new business— Associated Window Corporation. He was subsequently indicted for converting government property in violation of section 641.

The district court dismissed Tana's indictment. According to the court, "the legislative history of section 641 and of other sections of the federal criminal code indicates

that Congress did not intend section 641 to apply to theft or conversion of property in which the government merely holds a general security interest." *Id.* at 1396. The court indicated that it had found no cases in the 110 year history of section 641 and its predecessor where an individual had been indicted for converting property in which the government held only a security interest. The court further noted that:

Expanding section 641 in the manner urged by the Government would expose vast new areas of conduct to federal criminal prosecution. Anyone, anywhere, who, knowingly or unknowingly, misappropriated property in which the federal government had a security interest, would be subject to federal criminal prosecution. Inevitably, the courts will be forced to draw fine distinctions to delineate the reach of section 641 in this new class of cases. The development of an area of law fraught with such fine distinction can and should be avoided, particularly where, as here, a variety of criminal statutes appear capable of prosecuting the conduct alleged herein.

*Id.* at 1397.

The rationale used in the *Tana* case is convincing. Consistent with that reasoning we refuse to expand section 641 to include the conversion of property in which the government has a mere security interest. We acknowledge that this would be a much different case if the SBA had been listed as payee of the insurance check. *See United States v. Faust,* 850 F.2d 575 (9th Cir.1988) (affirming the defendant's conviction under section 641 where he received an insurance proceeds check made payable to his company and the Secretary of Transportation and he forged the Secretary's endorsement and deposited the check into his company's account). Nonetheless, that is not the case before us and despite the government's contention to the contrary, it is irrelevant that Howard's own intentional and culpable conduct prevented the SBA from being loss payee on the check. We have no doubt that

Howard's conduct was criminal under several other provisions of the United States Code. Even so, we must reverse Howard's conviction because the criminal conduct prohibited by section 641 is not the type of conduct that he engaged in.

We do stress, however, that our holding is a narrow one. It does not impact, for instance, those cases where a defendant is charged with stealing intangible property. Intangible property may unquestionably belong to the government. *See United States v. Matzkin,* 14 F.3d 1014 (4th Cir.1994) (information concerning Navy procurement practices is property of the United States within the meaning of section 641). Nor does it impact those cases where the government distributes property to local or state agencies and that property is subsequently stolen. "If the federal government maintains sufficient supervision and control over the property, we have held that the funds remain government property for purposes of federal prosecution under section 641." *Kristofic,* 847 F.2d at 1298 (citing *United States v. Wheadon,* 794 F.2d 1277 (7th Cir.1986), *cert. denied,* 479 U.S. 1093, 107 S.Ct. 1307, 94 L.Ed.2d 161 (1987); *United States v. Bailey,* 734 F.2d 296 (7th Cir.), *cert. denied,* 469 U.S. 931, 105 S.Ct. 327, 83 L.Ed.2d 263 (1984); *United States v. Maxwell,* 588 F.2d 568 (7th Cir.1978), *cert. denied,* 444 U.S. 877, 100 S.Ct. 163, 62 L.Ed.2d 106 (1979)). We only hold that the government's security interest in the insurance proceeds check is "not a thing of value of the United States" within the meaning of section 641.[7]

## CONCLUSION

For all of the foregoing reasons, we AFFIRM Howard's bank fraud conviction and REVERSE his conviction for conversion of government property. This case is REMANDED to the district court for resentencing.

---

7. Because of our holding, it is unnecessary for us to address Howard's contention that section 641

is unconstitutional as applied.