**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Edward W. MOEDE, Defendant–Appellant.**

**No. 94–2703.**

United States Court of Appeals, Seventh Circuit.

Argued Dec. 13, 1994.

Decided Feb. 13, 1995.

Steven M. Biskupic, Asst. U.S. Atty., Milwaukee, WI (argued), for plaintiff-appellee U.S.

David J. Cannon, Michael, Best & Friedrich, Milwaukee, WI (argued), for defendant-appellant Edward W. Moede.

Before CUDAHY, FLAUM, and EASTERBROOK, Circuit Judges.

FLAUM, Circuit Judge.

Defendant Edward W. Moede was convicted of three counts of bank fraud under 18 U.S.C. § 1344. Moede argues that his conviction must be reversed because the evidence of intent to defraud was insufficient. We affirm.

## I.

Moede was a vice-president and chief trust officer at the federally insured Associated Bank in Neenah, Wisconsin. Moede operated a rather extensive scheme in which he diverted the bank's trust fees and funds from legitimate trust accounts into various dummy trust accounts from which he made investments in the stock market. The scheme went on during the stock market boom from 1980 to 1987 and was evidently quite wide in scope.

The prosecution, however, focused on transactions involving two particular dummy accounts. In April, 1982, Moede opened a trust account for the "Cowles Partnership," which was supposedly for investments for the Cowles family. However, the family had no knowledge of the trust account's existence and never authorized any transactions involving this account and their money (the family had other legitimate trust accounts in their name at the bank). Moede used the "Cowles Partnership" account for a number of unauthorized financial transactions and as a primary depository for the diverted bank trust fees. In June, 1984, Moede opened the "Warren James" trust account, which was supposedly for the long-range investments of an individual named "Warren James." "Warren James," however, did not exist. The account had no assets of its own, and all the information supplied by Moede in creating the account was false, including a falsified trust agreement, forged "Warren James" signatures, and a "Warren James" [1] social security number that was really Moede's.

Moede engaged in three stock purchases for the "Warren James" account that were the subject of the indictment. In December, 1985, Moede purchased 2,000 shares of Central Jersey Industry stock for $41,320 for the account. As the "Warren James" account had no assets, it was on overdraft status until April 4, 1986, when Moede transferred $42,000 from the "Cowles Partnership" account into it to cover the purchase. Moede next purchased an additional 2,000 shares of Central Jersey Industry stock for $50,760 on June 30, 1986, followed by 2000 shares of Sommerset Savings Bank stock for $22,500 on July 9, 1986. The June and July purchases were ultimately covered by transferring $80,000 into the "Warren James" account from the "Cowles Partnership" account via an intermediate transfer through the trust account of Sallyann Pratt Cowles.[2] In total, between December, 1985 and May, 1987, the "Warren James" account acquired $140,436.50 of stock with $142,000 in funds taken from the "Cowles Partnership" account, most of the funds being diverted bank trust fees.

In the wake of the stock market crash of October, 1987, Moede informed the bank he had diverted funds into a dummy account. The "Warren James" account was liquidated, and the proceeds were retained by the bank to offset the lost bank trust fees.

On May 4, 1994, a jury found Moede guilty of three counts of bank fraud. Moede did not take the stand and presented no witnesses in his defense. At sentencing, the government put forth evidence that the "Warren James" transactions were merely a portion of Moede's improper activity at the bank. The government presented evidence that $305,820 of bank trust fees had been diverted since 1980. In addition, the bank ultimately had to reimburse accountholders approximately one million dollars, per order of the Comptroller of Currency.

Moede was sentenced to 48 months in prison on Count I of the indictment, received concurrent sentences of 36 months probation on Counts II and III, and was ordered to pay $1,360,000 in restitution.

## II.

Moede argues that the evidence is insufficient to show that he had the requisite intent to defraud for four reasons: 1) his conduct

1. The name "Warren James" was apparently selected because it was the name of one of Moede's sons.

2. Moede also made two additional stock purchases for the "Warren James" account, financed at least in part by funds taken from the account of Robert Cowles, Jr. Moede also placed some of his own funds into the "Warren James" account.

was an extension of the bank's practice of deferring fees; 2) there is no evidence he intended to gain any unfair advantage or obtain anything of value; 3) any loss was due to the bank's decision to liquidate the investments after discovering Moede's conduct; and 4) he intended to benefit the bank. In essence, Moede contends that he transferred bank trust fees to investment accounts to enable the bank's funds to earn higher returns by investing them in the stock market. Trust fees, as funds of the bank, could not be legally invested in stocks, while individual trust account funds could. Thus, Moede claims he intended to benefit the bank and not himself and that but for the crash and liquidation of the account by the bank, all would have profited handsomely, as had most people for whom he had invested. The government maintains that the evidence was more than sufficient, given Moede's deceit in setting up and operating the scheme and the tremendous losses suffered by the bank.

■ A challenge to the sufficiency of the evidence can only succeed if, after reviewing the evidence in the light most favorable to the prosecution, this Court concludes no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Howard*, 30 F.3d 871, 874 (7th Cir.1994). Arguments by a defendant that the evidence supports other equally rational inferences are unavailing, given this court's obligation to view the evidence in the light most favorable to the government. *United States v. Vasquez*, 909 F.2d 235, 240 (7th Cir.1990), *cert. denied*, 501 U.S. 1217, 111 S.Ct. 2826, 115 L.Ed.2d 996 (1991); *see also United States v. Martinson*, 37 F.3d 353, 356 (7th Cir.1994).

Moede was charged under former 18 U.S.C. § 1344(a), which provided:

(a) Whoever knowingly executes, or attempts to execute, a scheme or artifice—

(1) to defraud a federally chartered or insured financial institution; or

(2) to obtain any of the moneys, funds, credits, assets, securities or other property owned by or under the custody or control of a federally chartered or insured financial institution by means of false or fraudulent pretenses, representations, or promises, shall be fined not more than $10,000, or imprisoned for not more than five years, or both.[3]

He was convicted under the first prong of the statute—operating a scheme to defraud a financial institution.[4] Moede's sole contention on appeal is that the government has failed to prove Moede had the requisite intent to defraud.

■ Intent to defraud must be proven to obtain a conviction for bank fraud. *Howard*, 30 F.3d at 874; *United States v. LeDonne*, 21 F.3d 1418, 1426 (7th Cir.1994). We have defined intent to defraud as acting willfully and with specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another. *United States v. Sims*, 895 F.2d 326, 329 (7th Cir.1990). Intent to defraud can be proven by circumstantial evidence and by inferences drawn from the scheme itself. *Howard*, 30 F.3d at 874; *LeDonne*, 21 F.3d at 1426. Circumstantial evidence of intent to defraud includes such conduct as knowingly depositing a forged check,

---

3. The current version is very similar and provides:

Whoever knowingly executes, or attempts to execute, a scheme or artifice
(1) to defraud a financial institution; or
(2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises; shall be fined no more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1344.

4. The statute is written in the disjunctive, and a conviction for bank fraud can be obtained under either prong. *United States v. LeDonne*, 21 F.3d 1418, 1427 (7th Cir.1994); *see also United States v. Doherty*, 969 F.2d 425, 427 (7th Cir.1992), *cert. denied*, — U.S. —, 113 S.Ct. 607, 121 L.Ed.2d 542 (1992). Whether a scheme to defraud exists is evaluated by determining "whether the scheme demonstrated a departure from fundamental honesty, moral uprightness, or fair play and candid dealings in the general life of the community." *United States v. Hammen*, 977 F.2d 379, 383 (7th Cir.1992). The existence of a "scheme" does not seem to be contested, nor can it be seriously contested.

knowingly depositing an NSF check, knowingly writing checks on an inadequate account balance, violating bank rules, and providing falsified information on loan documents. *See, e.g., Howard,* 30 F.3d at 874; *LeDonne,* 21 F.3d at 1427–28; *Hammen,* 977 F.2d at 384; *United States v. Ragosta,* 970 F.2d 1085, 1090–91 (2nd Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 608, 121 L.Ed.2d 543 (1992).

■ There is ample evidence indicating Moede's intent to defraud in this case. He used false information and forged signatures to create the "Warren James" account, which he completely controlled. Moede knowingly purchased stock for the account, even though the account had no assets and the purchases would put the account on overdraft status. Moede obtained funds for the account by diverting the bank's trust fees into another dummy account and then transferring them to the "Warren James" account.

Moede argues that his conduct was merely an extension of the bank's occasional practice of deferring fees from one year to the next. While the bank apparently did on occasion shift trust fees from December of one year to January of the following year, Moede's conduct, as Moede concedes, went far beyond this. Moede deprived the bank of its trust fees for *years* during the operation of the scheme. While deferring fees might have potential advantages to the bank, losing those fees has no such advantages.

■ Moede argues that there was no intent to defraud because he never sought to obtain anything of value for himself. This argument is unavailing. It is not necessary for the defendant to receive personal benefit to support a conviction under the statute. *United States v. Knipp,* 963 F.2d 839, 846 (6th Cir.1992). It is sufficient the defendant intended to cause actual or potential loss to the financial institution. *LeDonne,* 21 F.3d at 1427–28; *United States v. Hord,* 6 F.3d 276, 282 (5th Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 1551, 128 L.Ed.2d 200 (1994); *Ragosta,* 970 F.2d at 1089.

■ Moede knowingly placed the bank's trust fees and the assets of customer accounts at risk in his investment scheme. Without question, the bank suffered substantial losses as a consequence of Moede's actions. The bank also suffered a considerable loss of business reputation with its customers; a necessary consequence of the customers' discovery that a trust department officer was engaging in such activity. Even if no losses had been sustained, the bank would be at risk of civil liability for losing custody of its accountholders' money. *See United States v. Morgenstern,* 933 F.2d 1108, 1114 (2nd Cir.1991), *cert. denied,* 502 U.S. 1101, 112 S.Ct. 1188, 117 L.Ed.2d 430 (1992).

■ Further, a jury would be free to draw the inference that Moede did intend to derive financial benefit from his actions. Moede created a dummy account over which he had complete control. He financed stock purchases for the account with the bank's trust fees and funds taken from other trust accounts. Moede asserts that he fully intended to return the principal, and presumably the profits, to the bank and accountholders when the investments flourished. The jury was free to draw the inference that, had the stock market not crashed, the profits were meant for Moede's pocket. In addition, Moede's contention, for which he cites no authority, that the bank should have waited until the market recovered to liquidate the account is unpersuasive. It hardly seems appropriate to require the victim of a fraud to wait until the scheme pans out, if it indeed ever will, to attempt to regain control of its funds. *See generally Hord,* 6 F.3d at 282 (withdrawal of funds need not be attempted by the wrongdoer; if the bank discovers the fraud it need not wait to take action).[5]

■ Finally, Moede's claim of a good faith intent to benefit the bank is meritless and has clearly been rejected by the jury. *See Sims,* 895 F.2d at 329 (defendant could be found to have the intent to defraud notwithstanding his claim of a good faith belief he

---

5. The record is also unclear as to whether Moede received any funds. While the government seems to concede no funds (with a small exception) could be traced directly to Moede's pocket, the fact remains that the transactions were sufficiently complex that not all the funds could be traced.

was assisting a government informant). *Cf. United States v. Crabtree*, 979 F.2d 1261, 1268 (7th Cir.1992), *cert. denied*, —— U.S. ——, 114 S.Ct. 216, 126 L.Ed.2d 173 (1993).

For the foregoing reasons, the district court's decision is AFFIRMED.