In the
United States Court of Appeals
For the Seventh Circuit

No. 99-1865

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

HENRY MASQUELIER, JR.,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 96 CR 157--Elaine E. Bucklo, Judge.

Argued November 3, 1999--Decided April 12, 2000

Before POSNER, Chief Judge, COFFEY and ROVNER,
Circuit Judges.

ROVNER, Circuit Judge.  The United States charged
Henry Masquelier with conspiracy to defraud the
Department of Defense in violation of 18 U.S.C.
sec. 371, and with defrauding the United States
in connection with a government contract in
violation of 18 U.S.C. sec. 1031. The district
court denied Masquelier's motion in limine
seeking to admit evidence of the government's
alleged wrongdoing in the execution of the
contract in question, and Masquelier then pled
guilty to the latter count, reserving his right
to appeal the district court's ruling. The
government dismissed the first count pursuant to
the plea agreement. We affirm.

I.

Masquelier was the owner and president of
Midstar, Inc., a company which machined and
assembled metal items. In 1989, Midstar
contracted with the Defense Logistics Agency, the
arm of the Department of Defense charged with
awarding and administering defense contracts, to
produce more than 30,000 fire hose nozzles for
Navy ships. The DLA agreed to pay $2,265,976.96
for the nozzles, and the contract provided that
Midstar could request progress payments from the
DLA to defray the costs associated with buying
materials and services necessary to the

completion of the contract. Masquelier took advantage of this provision, submitting a request for a progress payment in the amount of $150,169.00 to cover the cost of over 40,000 shutoff trunnions, a part of the fire hose nozzles, provided by a subcontractor named Mex-Am Machining, Inc. Masquelier certified in his request to the DLA that the cost was actually incurred and consistent with the contract, and the DLA paid this amount in full to Midstar.

The government charges that, in fact, no such parts were ever ordered or purchased by Midstar. Instead, Masquelier had obtained blank invoices from the former owner of the defunct Mex-Am Machining, and fraudulently filled them out to reflect that Mex-Am had delivered 47,000 trunnions to Midstar at a cost of more than $167,000. Masquelier then submitted the request for a progress payment, and the DLA issued a check for more than $150,000.00. Masquelier deposited the check from the DLA, and wrote a check to Mex-Am to make it appear that he had paid Mex-Am for the parts shown on the false invoices. Mex-Am's former owner (and Masquelier's soon-to-be co-defendant) assisted Masquelier by returning all of the money to Masquelier except for $3,206.54, his share in the scheme.

In the district court, Masquelier brought a motion in limine seeking to admit evidence that he intended at all times to complete the contract and that the government's wrongful actions put him in a position where the only way he could complete the contract was to submit the falsified request for a progress payment. In particular, he wanted to present to the jury the fact that shortly after signing the contract, he discovered that the specifications for the nozzles were faulty, and that the DLA then issued changes to the original contract specifications. These changes delayed production of the nozzles, according to Masquelier, and that delay created financial strains for Midstar. The DLA exacerbated the problem, Masquelier complains, by setting unrealistic delivery schedules, and then canceling part of the contract. Apparently on the brink of financial ruin, Masquelier asserts that the delays forced him to submit the request for a progress payment so that he would be able to complete the contract. All of this evidence is relevant, according to Masquelier, because it demonstrates that he did not intend to defraud the government; rather, he intended at all times to complete the contract and provide the government with the parts specified in the contract.

The district court denied Masquelier's motion, and instead granted the government's counter

motion to exclude any evidence of alleged wrongdoing by the DLA. The court noted that both statutes under which Masquelier was charged required the government to prove an intent to defraud. This intent to defraud, the district court found, was defined as "acting willfully and with specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another." United States v. Masquelier, 1998 WL 773997, *1 (N.D. Ill. October 27, 1998). For a sec. 371 charge, the government may show either that the defendant intended to cause the government a property or pecuniary loss, or intended to interfere with a lawful government function. Id. The court rejected Masquelier's argument that evidence of the DLA's delays, changes and cancellations was relevant to show that his intent was to complete the contract rather than to cause the government a loss. The court held that Masquelier's deceptive conduct exposed the government to an unwanted risk of never getting anything of value for the money that the DLA paid. Whether he intended to cause a loss in the long-run was irrelevant, the district court held, and could not negate his intent to obtain money for work that was not actually performed. Masquelier appeals.

II.

Masquelier invokes the venerable Oliver Wendell Holmes early in his argument, for the proposition that "Even a dog distinguishes between being stumbled over and being kicked." Oliver Wendell Holmes, Jr., The Common Law, quoted in Morissette v. United States, 342 U.S. 246, 252 n.9 (1952). He contends that he lacked the requisite mens rea for the fraud offenses charged. He did not intend to deprive the government of its property. Rather, he intended to complete the contract as promised. Evidence of the government's wrongdoing, under his theory, is relevant to show that he was forced to request the progress payment so he could complete the contract in the only way possible. He therefore sought to admit into evidence that the DLA acted improperly in the administration of the contract, that these actions put him in the position of being forced to seek the progress payment in order to complete the contract, and that the progress payment funds went not into his own pocket but were used to execute the contract. The government maintains that the only intent relevant to the crimes charged is Masquelier's intent to obtain $150,000 to which he was not entitled. Under the government's formulation, DLA's wrongdoing, if any, is wholly irrelevant, as is Masquelier's ultimate purpose of completing the contract.

We have held that sec. 371 "encompasses only conspiracies in which the defendants intended either to cause the government property or pecuniary loss or interfere with or obstruct a lawful government function." United States v. F.J. Vollmer & Co., Inc., 1 F.3d 1511 (7th Cir. 1993), cert. denied, 510 U.S. 1043 (1994). Masquelier himself cites cases where we formulated the intent to defraud as acting wilfully or knowingly, with specific intent to deceive or cheat, in order to obtain financial gain for one's self or cause financial loss to the victim. See United States v. Catalfo, 64 F.3d 1070, 1079 (7th Cir. 1995), cert. denied, 517 U.S. 1192 (1996); United States v. Moede, 48 F.3d 238, 241 (7th Cir. 1995). Presumably it is the third part of this formulation that Masquelier wishes to challenge, as he admittedly acted knowingly (as opposed to inadvertently), and certainly intended to deceive when he filled out blank invoices from a defunct company and submitted them to the government knowing the content was false. He was not, he claims, trying to obtain financial gain for himself or cause financial loss to the government, although he admits he submitted the request in order to obtain in excess of $150,000 from the government, money that he knew he was not entitled to under the contract. In support of his contention that he was not trying to obtain financial gain for himself, he points out that the money did not go into his personal account but went towards the completion of the contract.

We addressed that very issue in Moede, where we held that it is not necessary for the defendant to receive personal benefit to support a fraud conviction (in that case, bank fraud). Rather, it is sufficient that the defendant intended to cause actual or potential loss to the victim. 48 F.3d at 242. We have also held that it is irrelevant in a fraud prosecution that the defendant sincerely believed that he would ultimately be able to return the victim's money after his scheme succeeded. See United States v. Dunn, 961 F.2d 648, 650 (7th Cir. 1992) (an honest belief that the defendant will ultimately be able to perform is not itself a defense to the fraud crime charged); United States v. Chandler, 98 F.3d 711, 716 (2nd Cir. 1996) (intent to repay fraudulently obtained loan irrelevant in light of exposure of victim to potential loss).

Masquelier insists he is not propounding the affirmative defense of good faith but rather wishes to put on this evidence to show that the government cannot prove an element of the crime. However he frames his claim, the result is the same. His ultimate intention to make good on the contract is irrelevant to his intent to obtain

government money to which he was not entitled through deceptive means. As our esteemed Chief Judge commented at oral argument, to hold otherwise would require us to overturn a thousand years of criminal law. Indeed, Judge Posner challenged Masquelier to find a case with a contrary result, offering that if counsel was able to find such a case, Judge Posner would eat his hat "in public." Fortunately, the Chief will not be forced to feast on his fedora./1 Fraud is complete when the defendant obtains money by false pretenses. United States v. Stafford, 136 F.3d 1109, 1112 (7th Cir. 1998), modified, 136 F.3d 1115 (7th Cir. 1998), cert. denied, 119 S. Ct. 123 (1998). What Masquelier intended to do with the fraudulently obtained funds is irrelevant and the district court was well within its discretion to exclude any evidence of the government's allegedly bad acts or Masquelier's plans to follow through on the contract. Id. Masquelier did not stumble over the Department of Defense; he kicked it.

AFFIRMED.


/1 Masquelier cites Judge Posner in his opening brief for the proposition that intent should be approached in cost-benefit terms, imposing punishment only where it would serve as a deterrent to socially undesirable behavior. See Richard A. Posner, The Problems of Jurisprudence, ch. 5 (1990). Because he was engaging in behavior most likely to result in the contract being fulfilled (a socially desirable result), Masquelier urges that he should be allowed to put on his evidence. He boldly asserts that "any deterrent-creating sanctions in this case should be applied to the government, not the defendant." We are reminded of the adage defining chutzpah, where the man who kills both his parents throws himself on the mercy of the court because he is an orphan. True, certain theories of economic efficiency are easy to misapprehend, but we are beyond certain that Judge Posner would not advocate fraud as a self-help remedy for breach of contract.