In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2440

United States of America,

Plaintiff-Appellee,

v.

Michael R. Lamarre,

Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 99-CR-185--John C. Shabaz, Chief Judge./1

Argued March 7, 2001--Decided April 20, 2001

  Before Diane P. Wood, Evans, and Williams, Circuit
Judges.

  Evans, Circuit Judge.  Over 200 years ago, Edmund
Burke proclaimed "the age of chivalry is
dead."/2 And it hasn't made much of a comeback.
Certainly our appellant, Michael Lamarre, will
win no awards for chivalry as his defense to an
indictment charging him with five counts of bank
fraud and one of using a phony social security
number to obtain a loan was to try and pin the
rap on his wife. A jury, apparently determining
Mr. and Mrs. Lamarre were in cahoots, found him
guilty, and he appeals. Although we conclude that
the district judge erred in keeping from the jury
a bit of evidence Lamarre wanted to offer to
bolster his defense, we conclude the error was
harmless.

  The events that led to Michael Lamarre's trial
began in Florida in 1986, where he and Carla, his
wife, were known as Robert and Carla Harrell./3
Together they borrowed $200,000 from Farm Credit
of Southwest Florida to purchase 203 head of
cattle for their dairy farm business, Bristol
Dairy, Inc. In return, the Harrells pledged the
cattle and their farm equipment as security for
the loan. This deal was destined to go sour as
the Harrells provided a wealth of false
information on their loan application, including
false social security numbers, descriptions of
assets they did not own, and grossly inflated

earnings figures. Later, Farm Credit discovered that the Harrells were not caring for the cattle, so it obtained a writ of replevin and attempted to seize the herd. The Harrells filed for bankruptcy, but the bankruptcy court later dismissed their petition when they failed to attend a meeting of creditors. When the bank eventually seized its collateral, it discovered that 74 cows and various items of pledged farm equipment were missing. Thirty cows that were found did the bank little good as they had to be destroyed due to illness.

The Harrells missed the Florida meeting of creditors because they fled to Wisconsin. In September 1997 Carla, then using the surname Lamarre, contacted Mark Binversie, the president of Investor's Community Bank in Manitowoc, Wisconsin. She told him that she and her husband were planning to relocate their dairy farming business, which she called "Northern Star Farms," to Oconto, Wisconsin, and they were interested in borrowing money to purchase a herd of dairy cattle. Carla represented that she and Michael had substantial dairy experience and that her husband was still employed on a large farm in Florida. Binversie was impressed and told her that their farm experience was an important factor in the bank's consideration of the loan request. Carla and Michael, also then using the surname Lamarre, applied for the loan and submitted financial statements, federal income tax returns, information about their Florida loans, letters of recommendation, and a business plan naming Michael as the CEO of the business. Almost all of this information was false: the financial reports substantially inflated their financial status and did not disclose that they had declared bankruptcy; the social security numbers on the loan application were not theirs; the federal tax returns were never submitted to the IRS; the information about their Florida banker was false; and one of the letters of recommendation was from "John Harrell." The bank did not verify this information prior to approving a loan for $180,000.

The Lamarres gave the bank security interests in their soon-to-be-purchased real estate, cattle, farm equipment, and proceeds from the sale of milk. A loan closing was held on December 1, 1997, and that was the first time Binversie met Michael. Binversie explained the loan agreement to the Lamarres line-by-line and read aloud every word of the agreement. He recalled that Michael appeared to understand both the agreement and the paperwork he signed. At the Lamarres' request, the bank advanced $16,500 on the day of closing to enable them to purchase 15 cows. The Lamarres asked Binversie to make the

check payable to "John Harrell," who they said was the seller of the cattle. Later, Michael took the check to Florida and used it and another false social security number to open a bank account in the name of John Harrell. Michael endorsed the check with the name "Michael Harrell," and in the teller's presence he endorsed it again as "Robert Harrell." He deposited $100 in the new account and took the rest in cash, telling the bank that he was a truck driver and that he needed the cash to repair his truck. Six days later he closed the account and returned to Wisconsin. Back in Wisconsin, the bank paid out the remainder of the loan, and the Lamarres used the money to purchase cattle.

On December 17, 1997, the Lamarres attended the closing on an Oconto dairy farm they had contracted to buy. Although they had agreed to make a $50,000 down payment on the property, Michael wanted to renegotiate the terms of the contract at the closing. The seller's attorney testified that Michael appeared to fully understand the transaction and the terms of the contract and that Michael did most of the negotiating. After some haggling, the sellers agreed to sell their farm to the Lamarres for $350,000 with no down payment.

The Lamarres also applied for and received several credit cards from Binversie's Manitowoc bank. After the loan closing they took out a $9,500 cash advance on one of the cards. Michael took out another $3,000 cash advance on another card, which he used as a down payment on a hog-- not a farm animal but a $24,500 Harley Davidson motorcycle. Michael then leased a $25,000 Ford pickup and a $29,500 Oldsmobile sport utility vehicle. On all three contracts Michael provided false social security numbers and false information about his income, past employment, bankruptcy history, and education. The finance managers of the Ford and Oldsmobile dealerships testified that they completed lease applications for Michael based on his oral answers to their questions, and each stated that Michael appeared to understand the terms of the contracts. The Harley Davidson dealer testified that Michael inquired about the specifications of several cycles, haggled with him over the purchase price, and negotiated the down payment and interest rate of his installment contract.

All the while, the Lamarres attempted to conduct a dairy business. But by the spring of 1998 Binversie, himself a dairy farmer, became suspicious of the Lamarres' ability to run a dairy farm. Binversie had on several occasions taken Michael to look at cattle to purchase. Each

time, Michael failed to inspect the "working end" of the cattle and purchased them without first inspecting their health records. Additionally, the terms of the loan required the Lamarres to deposit the proceeds of their milk sales into a bank account, and Binversie observed that their deposits were too small for the amount of milk the Lamarres were supposed to be selling. (Unbeknownst to Binversie, the Lamarres diverted milk proceeds to accounts at other banks.) When Binversie visited the farm to see what was going on, he discovered the cows living in unhealthy conditions. Binversie also noticed that the encumbered farm equipment was not there. Michael told him it was in the process of being shipped from out of state, but on later visits Binversie never saw it.

Later, the Lamarres deposited a $23,240 check from "Bristol Dairies," their defunct Florida business, in their Manitowoc bank account. Carla said the money was proceeds from the sale of cattle in Florida. The check bounced because the Bristol bank account no longer existed, but not before the Lamarres wrote several other checks on the account. Binversie confronted Michael about the bounced check and Michael expressed surprise, telling Binversie that Bristol had always been a reliable customer. Binversie, now concerned about his security, quickly obtained a writ of replevin to seize the collateral. On May 4, 1998, the bank seized 117 unhealthy cows from the Lamarre's farm. But 23 cows were missing. The bank seizures prompted the Lamarres to flee to Florida with the Ford, Oldsmobile, and Harley Davidson.

A grand jury indicted both Michael and Carla. Michael was charged with five counts of defrauding a federally insured banking institution in violation of 18 U.S.C. sec. 1344 and one count of using a false social security number to obtain a loan from a bank in violation of 42 U.S.C. sec. 408(a)(7)(B). The FBI arrested Michael and seized the vehicles in Florida a year later. When arrested, Michael had his legitimate social security card in his wallet.

The district court severed Michael's and Carla's trials, and Carla later pleaded guilty. Michael's defense theory was that he was incapable of reading or understanding the various loan documents he signed and therefore could not have formed the specific intent to defraud the bank. His defense was that Carla "masterminded" the fraud and that he blindly signed documents at her instruction. In support of his theory, he proffered the opinion of Dr. Christopher Ovide, a board-certified clinical psychologist. Dr. Ovide tested Michael after his indictment and offered to testify that he had an IQ of 70,

placing Michael in the second percentile for adults his age. Dr. Ovide described Michael as being in the "borderline intellectual functioning range of intelligence." Dr. Ovide also determined that Michael had a second-grade reading ability and a first-grade spelling and arithmetic aptitude. The district judge, however, excluded Dr. Ovide as a witness, believing that his testimony would invade the province of the jury and would do nothing more than suggest that Michael was not intelligent enough to lie and defraud.

Michael's stepchildren, Angel and Alan Lamarre, testified on his behalf. Angel testified that she never saw Michael read a book or newspaper--although she admitted that she had seen him read classified advertisements--and that she often assisted her stepfather in filling out the simplest of forms. Angel also stated that Carla handled all the household paperwork and financial matters, and she suggested that Carla had engaged in suspicious financial activity long before she married Michael. Alan confirmed Angel's testimony and stated that in the 15 years he knew Michael he had never seen him read a book or newspaper. Neither Michael nor Carla testified.

The jury found Michael guilty on all counts. A presentence investigation report (PSR) recommended an adjusted offense level of 16 and 9 criminal history points, placing Michael in criminal history category IV with a sentencing range of 33 to 41 months. The government, however, believed that the recommended criminal history category did not adequately reflect Michael's past criminal conduct and recommended adjusting his criminal history under U.S.S.G. sec.4A1.3(e) to come up to a total of 15 points. The judge agreed, and Michael wound up in criminal history category VI with a sentencing range of 46 to 57 months. He was sentenced to a term at the top of the range.

Michael argues that the district judge abused his discretion by excluding Dr. Ovide's testimony because the judge misunderstood the purpose for which it was offered. He asserts that Dr. Ovide would have testified only that Michael lacked the intellectual capability to understand the nature of the various financial transactions that gave rise to his crimes, not that he was not intelligent enough to commit fraud. And because he was accused of committing specific intent crimes, Michael contends that the exclusion of Dr. Ovide's testimony denied him the opportunity to challenge the government's evidence of his mental state. We review evidentiary rulings for abuse of discretion. United States v. Byrd, 208 F.3d 592, 594 (7th Cir. 2000).

The parties confined most of their argument in the district court on this issue to whether Michael gave the government sufficient notice under Federal Rule of Criminal Procedure 16(b)(1)(C) of his intent to call Dr. Ovide as an expert witness and whether Dr. Ovide's testimony would be sufficiently reliable under the principles of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). The district judge chose not to address these arguments and rejected the proffer on its merits, stating:/4

The Court differs with both counsel. It believes that this type of opinion evidence goes--invades the common sense inquiry of jurors as to the circumstances under which a party may have been acting. And the fact is to indicate that because he has a second grade level of education that accordingly that suggests that he cannot be involved in a fraudulent activity is so far from what the Court believes to be appropriate in a matter of this nature that I have no qualms whatsoever in excluding this type of testimony. I can imagine that it's going to be brought forward in practically 40 percent of all the cases which this Court ever has the opportunity to try.

And it would appear that the defense is that you've got a low level of education, you don't read very well, you don't write very well and, ergo, you certainly can't commit any fraudulent conduct and the Court does not believe that that is appropriate testimony. It believes it is not relevant to the actions of which the defendant is charged. And the fact of the matter is, I have to take some judicial notice, even though I guess I shouldn't, but my nine-year-old who's in the third grade may have that level also but he sure knows what it is to tell an untruth.

Now I realize this is an oversimplification and the Court's going to be criticized for that, but from all the documents which this Court has read in this matter this Court believes that this is not an area for an expert to testify where the jury may use its common sense inquiry and they as untrained layman are able to make those determinations without the necessity of expert testimony. I realize that's not the argument of the government but it jumps out at the Court when addressing a matter of this nature, and accordingly I'm going to exclude the testimony.

When faced with a proffer of expert testimony under Federal Rule of Evidence 104(a), trial judges must ensure that the expert's testimony is reliable and relevant. United States v. Cruz-

Velasco, 224 F.3d 654, 660 (7th Cir. 2000). Daubert, 509 U.S. at 597, and Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999), supply the reliability test. The government and Michael now both agree that Dr. Ovide's testimony would have been scientifically valid and thus reliable under Daubert and, since the district judge made no findings on the validity of the doctor's scientific methodology, we won't question it. But before proceeding to relevance, we wish to reiterate the importance of applying the Daubert framework in cases such as this. Not only does the Daubert framework help judges distinguish between real and "courtroom" science, see Rosen v. Ciba-Geigy Corp., 78 F.3d 316, 318 (7th Cir. 1996), but we have also stressed its importance in helping trial judges understand the purpose of the expert evidence, see United States v. Hall, 93 F.3d 1337, 1345 (7th Cir. 1996). This is perhaps most important when dealing with experts in the field of social science. Parties typically offer experts in human behavior and mental disorders to testify about everyday subjects. Certainly laypersons are qualified to evaluate things within their everyday experience, but scientifically valid social science can be offered to show a jury that their commonly held beliefs are incorrect. See Tyus v. Urban Search Mgmt., 102 F.3d 256, 263 (7th Cir. 1996); United States v. Hall, 165 F.3d 1095, 1118-19 (7th Cir. 1999) ("Hall II") (Easterbrook, J., concurring); Hall, 93 F.3d at 1345; Krist v. Eli Lilly & Co., 897 F.2d 293, 296-97 (7th Cir. 1990); Carroll v. Otis Elevator Co., 896 F.2d 210, 215 (7th Cir. 1990).

We think that is precisely the case here. Dr. Ovide proposed to testify that Michael had a very low IQ and the reading ability of a second grader. One of the facts at issue was whether Michael understood that his conduct was designed to defraud the banks. He wanted to prop up his claim that it was Carla's show, not his. Michael presented witnesses who testified that he truly was a dairy farmer, albeit not a very good one. It is also undisputed that Carla controlled the books and financial records. On the other hand, the government presented several witnesses who testified that Michael appeared to understand the documents he signed. Dr. Ovide, however, would have testified that Michael's low cognitive skills made him dependent on Carla to conduct their financial business. He believed that Michael's personality suggested that he was somewhat "interpersonally dependent" and felt a "need to please others and avoid doing things that would alienate the person or persons he depends on." The judge thought that the jury had the common sense to determine whether Michael understood that he was defrauding a bank. They

did, but that alone does not justify excluding Dr. Ovide's testimony. Trial courts are not compelled to exclude all expert testimony merely because it overlaps with matters within the jury's experience. Hall, 93 F.3d at 1342, 1344.

Moreover, the government would have been free to challenge the weight of his report summarizing his evaluation of Michael on cross-examination. In the report, Dr. Ovide noted several possible inconsistencies with Michael's purported mental functioning. For instance, on two tests that explored Michael's ability to recognize spacial relationships, he scored "unusually low" on Block Design, yet he tested strongly on Object Assembly. Further, Dr. Ovide noticed that Michael's intellectual ability was "far below what was expected given his history and general mental status and social interaction." Dr. Ovide, however, also cautioned that Michael's personality pattern suggested that he may have exaggerated his responses on some of the tests, although Dr. Ovide thought that the level of exaggeration was probably consistent with a person "facing his current situation," i.e., an indictment charging six felonies. We therefore conclude that the district court erred in excluding this testimony for the reason given by the judge. Whether it should have been excluded on notice grounds, as the government argued at trial, is a matter we need not consider for reasons that will soon become clear.

Evidentiary errors, of course, are subject to harmless error review. United States v. Wesela, 223 F.3d 656, 663 (7th Cir. 2000). We will not reverse unless the error affected substantial rights, Byrd, 208 F.3d at 594, or had a "substantial or injurious effect or influence on the jury's verdict," United States v. Jarrett, 133 F.3d 519, 529 (7th Cir. 1998).

A bank fraud conviction requires proof that a defendant had the specific intent to defraud the bank. United States v. Moede, 48 F.3d 238, 241 (7th Cir. 1995). "Specific intent to defraud" means that a defendant acted willfully and with specific intent to deceive or cheat, usually for financial gain for one's self or the causing of financial loss to another. Id. Specific intent may be established by circumstantial evidence and inferences drawn from the scheme itself. See id. We have specifically held that actions such as knowingly depositing an NSF or forged check, knowingly writing checks on an inadequate account balance, and providing false information on loan documents constitute circumstantial evidence of specific intent to defraud. Id. at 242. Moreover, the evidence here of uncharged acts (the Florida matters and the vehicle deals) intricately

related to the acts charged in the indictment were admissible to establish Michael's fraudulent intent. See United States v. Gibson, 170 F.3d 673, 680 (7th Cir. 1999); see also United States v. Ryan, 213 F.3d 347, 351 (7th Cir. 2000) (evidence casting doubt on credibility of defendant's claim that he was ignorant of fraudulent aspects of transaction is probative of specific intent to defraud).

Despite the undisputed evidence that Carla was the prime mover in this case, the testimony of witnesses suggesting that Michael appeared to understand the documents he signed was strong. Michael also, without Carla's heeding, endorsed a bank check intended for the purchase of cattle (the "John Harrell" check) over to himself, took it to Florida, assumed a different name, and cashed it, telling the bank he was a truck driver. Michael also deposited a $23,000 check drawn on a closed account from Bristol Dairies, his Florida business. When confronted, he told Binversie that he had never had trouble with Bristol Dairies before as they were always a reliable customer. He purchased and leased three vehicles by providing false financial and personal information. Michael used several false social security numbers, even though it appears he kept his legitimate social security card in his wallet, or at least had it there when he was arrested. The Lamarres also pledged farm equipment that never materialized for the loan, and, when confronted, Michael falsely told Binversie that the equipment was being shipped from out of state. Based on this evidence, we believe that no rational jury would think that Michael was ignorant of the fraud scheme, and thus we conclude that the exclusion of Dr. Ovide's testimony was no more than harmless error.

Finally, Michael challenges his sentence. He argues that he was entitled to have the facts upon which the district court enhanced his criminal history found by the jury beyond a reasonable doubt under Apprendi v. New Jersey, 530 U.S. 466 (2000). He does not challenge the district court's decision to enhance his criminal history category. Michael did not raise his Apprendi argument at sentencing, so we review it only for plain error. United States v. Jackson, 236 F.3d 886, 887 (7th Cir. 2001); United States v. Nance, 236 F.3d 820, 824-25 (7th Cir. 2001). But regardless of the scope of our review, our cases compel us to reject his argument. Apprendi holds that any fact (except the existence of a prior conviction) that increases a sentence beyond the statutory maximum for the particular offense must be submitted to the jury and proved beyond a reasonable doubt. Jackson, 236 F.3d at

887. Michael's sentence does not exceed the maximum term for bank fraud, see 18 U.S.C. sec. 1344, so Apprendi does not apply, United States v. Williams, 238 F.3d 871, 877 (7th Cir. 2001).

   Accordingly, we AFFIRM Michael Lamarre's convictions and sentences.


/1 The Honorable John C. Shabaz, Chief Judge of the Western District of Wisconsin, presiding.

/2 Edmund Burke, Reflections on the Revolution in France (1790).

/3 To avoid confusion, we will refer to the appellant as "Michael" and his wife as "Carla" throughout the rest of this opinion. Generally, Michael was known as "Robert Harrell" in Florida and "Michael Lamarre" in Wisconsin. He was born as Robert Edward LeDane, but he legally changed his name to Robert Harrell in 1995. Michael later attempted to legally change his surname to "Lamarre," Carla's maiden name, but apparently never completed the process.

/4 We have reprinted the transcript as is, without inserting any "sics."