In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 23-3368

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DANA CURTIN,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Central District of Illinois.
No. 22-cr-10018 — **James E. Shadid**, *Judge.*

_____

ARGUED FEBRUARY 27, 2025 — DECIDED JULY 1, 2025

_____

Before ST. EVE, LEE, and MALDONADO, *Circuit Judges.*

ST. EVE, *Circuit Judge.* A jury convicted Dana Curtin of attempted sex trafficking of a minor. The government based the charge on text communications between Curtin and a federal agent posing as the father of a 12-year-old girl. The two discussed Curtin paying for sex with the agent's "daughter." After ten weeks of intermittent texting, Curtin went to meet the girl and her "father" at an agreed upon location, where law

enforcement arrested him. The district court sentenced Curtin to 180 months' imprisonment.

In this appeal, Curtin challenges the district court's exclusion of two lines of expert testimony. Because Curtin waived his challenge to the exclusion of one and the district court acted within its discretion in excluding the other, we affirm Curtin's conviction.

## I. Background

**A. Factual History**

Dana Curtin strayed outside of his marriage for sexual partners. He visited one website dedicated to "selling sex for money" almost daily. While browsing, he came across an advertisement offering a "girl" for "some taboo no limits fun." Entitled "TabuFun," the post stated the prices for several sex acts, and included a picture of a young-looking woman who weighed "95 pounds" and was "99 years old."

In reality, the advertisement depicted an FBI confidential informant. Agent Kurt Bendoraitis created the post because the FBI had identified real minors operating on the site. About two hours after the post went live, Agent Bendoraitis received a text from Curtin asking whether the girl was available the next day. Posing as the girl's father, Agent Bendoraitis discussed timing, sexual acts, and the girl's age: 12 years old. Curtin assumed the girl's "father" was just "messing around" on the site. After Agent Bendoraitis assured Curtin that the advertisement was real and that he was not setting Curtin up, the two began to discuss logistics. Curtin asked whether the girl was "okay with all this" and whether she had "[s]een guys before[.]"

The two continued to communicate via text over the next ten weeks, during which time Agent Bendoraitis continuously reminded Curtin of his "daughter's" age. When conversation lagged, Curtin was typically the one to reinitiate it. After one lull, Curtin texted that he would love to get together. Agent Bendoraitis asked how long Curtin wanted to be with the "12 y[ear] o[ld]," to which Curtin responded, "I'm not sure what 12 yo means and don't want to know, but I think [$]150 … was what we talked about last time." Agent Bendoraitis once again reminded Curtin that the girl was 12 years old. After he asked whether Curtin had condoms, Curtin replied "sure," said he did not remember what the girl looked like, and Agent Bendoraitis sent a picture. Curtin responded, "Okay. Just [let me know] the plan." Curtin then sent a picture of $150 in cash at Agent Bendoraitis's request.

Agent Bendoraitis and Curtin decided they would meet at a public place on May 19, 2022. Curtin arrived first, and Agent Bendoraitis texted him to go into the nearby store to buy a smoothie for the girl. Curtin did not get out of his truck. After five minutes, law enforcement officers at the scene moved to arrest him.

The officers uncovered condoms, personal lubricant, and cash in Curtin's vehicle. The cash totaled $240, with $150 in a separate compartment. Officers also searched Curtin's phone, which contained evidence of adult pornography and solicitation of prostitutes, but no child sexual abuse material ("CSAM") or material associated with a sexual interest in children. When asked about the purpose of his meeting with the girl that day, Curtin claimed that he wanted to see if it was "real." He explained that he did not report his conversation

with her "father" because he was embarrassed that he used the website for sex.

**B. Procedural History**

A grand jury indicted Curtin with attempted sex trafficking of a minor, in violation of 18 USC §§ 1591(a)(1), (b)(1), & 1594(a).[1]

In preparation for trial, Curtin disclosed his intent to present the testimony of forensic psychiatrist Dr. Fabien Saleh. Dr. Saleh's terse report concluded that Curtin "does not meet the Diagnostic and Statistical Manual's ['DSM-5's'] diagnostic criteria for Pedophilic Disorder or any other paraphilic disorder." Citing to the DSM-5, Dr. Saleh found "no evidence in support of 'intense sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child or children.'" He also clarified that "the presence or absence of a diagnosis [for] Pedophilic Disorder … does *not* negate the offense conduct as alleged." "In fact," he continued, "individuals who engage in criminal sexual conduct represent a heterogenous population and some of them do and some do not suffer from a diagnosable mental health condition."

In response to the government's motion to exclude Dr. Saleh's testimony, Curtin argued that the testimony bore relevance to intent—namely, that Curtin's "intent was to rescue the minor from what he believed to be a human trafficking situation." Curtin also asserted that Dr. Saleh's testimony

---

[1] The grand jury also indicted Curtin with attempted enticement of a minor, in violation of 18 USC § 2422(b), but the government voluntarily dismissed that count at the start of trial.

would be "essential" to rebut the testimony of the government's identified expert witness, who the government ultimately withdrew.

At the start of trial, defense counsel restated her desire to call Dr. Saleh "to explain to the jury the factors to consider with intent." In response to the court's remark that caselaw precludes admission of "expert testimony on a diagnosis or lack thereof of … pedophil[ic] disorder," defense counsel responded, "I agree with you, Judge, and we're not trying to call him to talk about pedophilia." Counsel explained that Dr. Saleh would rebut Agent Bendoraitis's testimony regarding what actions evince intent. The court reserved ruling, observing that if the government opened the door, the court might permit Dr. Saleh to opine on intent.

Later during trial, the court pushed defense counsel on what, precisely, Dr. Saleh would testify to:

> [Y]ou have indicated a couple of times that you think your expert should be able to testify as to factors the jury should consider on the issue of intent. Tell me what those are, and have those been – I'm looking at his report … and I'm not seeing it. So tell me what that would be.

Curtin's counsel first acknowledged that she "did assert" she would not solicit an opinion regarding Curtin having pedophilic disorder. She then explained that Dr. Saleh would testify about what an expert relies upon to determine that a person lacks pedophilic disorder. Pressed again by the court for greater precision, Curtin's counsel provided some examples: "the fact that someone engages in paid-for sex with adults does not mean that you can extrapolate they paid for

sex with a child," and "[t]he fact that someone views adult pornographic material … is very distinguishable" from viewing CSAM.

After considering arguments from both parties, the district court excluded Dr. Saleh's testimony as insufficiently helpful to the jury. It described the proposed testimony as "kind of a commonsense thing for all of us." The court acknowledged that it would have been "more inclined" to allow Dr. Saleh's testimony had the government introduced its own expert. It also cautioned the government against converting Agent Bendoraitis's factual testimony into anything bordering expert testimony. With these caveats, the court invited Curtin to make his argument—that his interest in sex with adults does not evince a sexual interest in minors—without an expert.

The trial lasted three days. Agent Bendoraitis and one other agent testified for the government, and five witnesses, including Curtin, testified for the defense. Curtin stated that he engaged with Agent Bendoraitis because he wanted to find out if it was "real"—if someone was "really" offering a 12-year-old girl for sex—and to "turn him in." But he acknowledged that he never reported the situation to authorities. After deliberating for approximately five hours, the jury returned a guilty verdict. The court sentenced Curtin to 180 months' imprisonment, the statutory minimum.

Curtin now appeals.

## II. Discussion

Curtin faults the district court for excluding two lines of expert testimony from Dr. Saleh: (1) Curtin lacked pedophilic tendencies; and (2) an interest in adult sex and pornography does not evince an interest in child sex and CSAM.

Curtin has waived the first challenge. To preserve an issue for appeal, a defendant must make "a timely and specific objection … [that] notif[ies] the court and the opposing party of the potential error and the ground for objection." *United States v. Burns*, 843 F.3d 679, 685 (7th Cir. 2016) (citation modified). A failure to object that is intentional or otherwise strategic results in waiver and precludes appellate review. *See United States v. Olano*, 507 U.S. 725, 733 (1993); *United States v. Flores*, 929 F.3d 443, 447 (7th Cir. 2019). We regularly find waiver where the defendant or defense counsel affirmatively agreed with a decision of the district court. *See, e.g.*, *United States v. Robinson*, 964 F.3d 632, 640–41 (7th Cir. 2020) (finding waiver where counsel "affirmatively agreed with [the court's] recitation of the record"); *United States v. McGhee*, 98 F.4th 816, 824 (7th Cir. 2024) (the defendant's acknowledgement that caselaw foreclosed an argument resulted in waiver); *Flores*, 929 F.3d at 449 (a defendant "obvious[ly]" and "intentionally" waives a sentencing challenge "when he affirmatively t[ells] the district court that he ha[s] no objection" (citation modified)).

That is what happened here. The court expressed that caselaw precluded expert testimony on a diagnosis or lack thereof of pedophilic disorder. Rather than offering a "specific objection" to alert the court to a purported error, *Burns*, 843 F.3d at 685, Curtin's counsel responded, "I agree with you, Judge, and we're not trying to call him to talk about pedophilia." Right or wrong as a matter of law, counsel's "state[ment] on the record" agreeing with the court's conclusion constitutes waiver. *Robinson*, 964 F.3d at 640–41.

Resisting this conclusion, Curtin points to several statements that he contends preserved his request for Dr. Saleh to

testify to his lack of pedophilic tendencies: statements found in his expert report, response to the government's motion *in limine*, and made during trial. Many of these statements were made before Curtin's counsel unambiguously agreed that such testimony was irrelevant and disclaimed any intent to rely on it.

In any event, rather than preserve his argument, Curtin's statements throughout the pendency of this case reflect fluctuation and opacity regarding what, precisely, Dr. Saleh would testify to. In his response to the government's motion *in limine*, for example, Curtin claimed that Dr. Saleh's testimony regarding Curtin's lack of pedophilic disorder was relevant to his intent to "save" or "rescue" a minor, but elsewhere pronounced that "what can or cannot be admitted in relationship to pedophilia is of no consequence." During trial, when the court understandably expressed confusion about the contours of Dr. Saleh's testimony, Curtin provided two examples that pertained to the disconnect between a desire to engage in sex with an adult as compared to sex with a minor. None of these statements signaled to the court that Curtin sought to introduce testimony about his lack of pedophilic tendencies. Instead, considered alongside his agreement with the court on relevance, they reflect a decision to forgo reliance on pedophilic tendency testimony in favor of other kinds of testimony.

Which brings us to Curtin's remaining challenge: the district court erred in excluding Dr. Saleh's testimony that (1) "the fact that someone engages in paid-for sex with adults does not mean that you can extrapolate they paid for sex with a child"; and (2) an interest in viewing adult pornography is "very distinguishable" from an interest in viewing CSAM.

Curtin argues that he needed Dr. Saleh's testimony to show that, although the government argued that Curtin had "sex on his mind," it was not "sex with a minor."

The court excluded the testimony as not helpful to the jury. *See* Fed. R. Evid. 702. Because Curtin has not challenged the court's application of the appropriate legal standard, which would trigger de novo review, we review for an abuse of discretion. *Carter v. City of Wauwatosa*, 114 F.4th 866, 879 (7th Cir. 2024). Under this highly deferential standard, we will reverse only if the court made a "manifestly erroneous" decision, *United States v. Tsarnaev*, 595 U.S. 302, 323 (2022) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997))—that is, a decision with which "no reasonable person" could agree, *United States v. Brown*, 871 F.3d 532, 536 (7th Cir. 2017).

Federal Rule of Evidence 702(a) permits only *helpful* expert testimony. *United States v. Gan*, 54 F.4th 467, 475 (7th Cir. 2022). Expert testimony is not helpful if the jury, using logic or common sense derived from everyday experiences, does not need an expert to understand the evidence and arguments presented. *See Salem v. U.S. Lines Co.*, 370 U.S. 31, 35 (1962); *United States v. Christian*, 673 F.3d 702, 710–11 (7th Cir. 2012). Although district courts "are not compelled to exclude all expert testimony merely because it overlaps with matters within the jury's experience," *United States v. Lamarre*, 248 F.3d 642, 648 (7th Cir. 2001) (citing *United States v. Hall*, 93 F.3d 1337, 1344 (7th Cir. 1996)), they may in their discretion "properly" exclude such testimony if "the primary facts can be accurately and intelligibly described to the jury" and if its members "are as capable of comprehending the primary facts and of drawing correct conclusions from them" as expert witnesses, *Salem*, 370 U.S. at 35; *see also United States v. Dewitt*, 943 F.3d 1092,

1096 (7th Cir. 2019) ("If the matter is within the jurors' understanding, the expert testimony is not 'specialized knowledge' that 'will help the trier of fact'…." (quoting Fed. R. Evid. 702)); *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 871 (7th Cir. 2001) ("the district court was well within bounds" to exclude "commonsense" expert testimony).

The district court did not abuse its broad discretion in excluding Dr. Saleh's testimony. It determined that the jury did not need an expert to understand that an interest in sex or pornography involving adults does not imply an interest in the same involving minors. We have said that "[j]urors bring to their service the totality of lived experiences … as adults." *Dewitt*, 943 F.3d at 1097. Each of these experiences "instill the knowledge, judgment, and common sense requisite to tell the difference" between an interest in minor and adult sex. *Id.* This is true even if the manner of adult sex Curtin engaged in—e.g., exchanging money for sex—is itself not commonly accepted.

The court also expressly permitted Curtin to make arguments concerning the difference between an interest in sex with adults and minors, undermining Curtin's contention that he could not rebut the government's argument without Dr. Saleh's testimony. Curtin presented evidence regarding the absence of CSAM on his phone, and multiple witnesses (Curtin included) testified about his lack of sexual interest in children. Given the evidence that came into the record, the absence of any government expert, and the jury's ability to understand the commonsense distinction at issue, we cannot say

that the district court's decision to exclude the evidence was manifestly erroneous.[2]

Even if the court improperly excluded Dr. Saleh's testimony, though, and assuming Curtin preserved his challenges, harmless error review applies to the court's evidentiary decisions. *Gan*, 54 F.4th at 475; Fed. R. Crim. P. 52(a). We will reverse only if "the prosecution's case would have been significantly less persuasive" absent the court's errors. *United States v. McGhee*, 88 F.4th 1236, 1240 (7th Cir. 2023). To make this determination, "we consider the entirety of the evidence that the government presented." *United States v. Boros*, 668 F.3d 901, 910 (7th Cir. 2012).

Curtin himself admits that the government's evidence "was sufficient to infer criminal intent." Brief for Appellant at 37. More than that, it strongly evinced Curtin's guilt. Curtin consistently reinitiated conversation with Agent Bendoraitis and continued those conversations for ten weeks. He prompted the agent to send him a picture of the girl he believed to be 12 years old, and after receiving it, immediately expressed his intent to move forward with the plan. Curtin drove to the meeting point, bringing with him $150 earmarked for the encounter in a separate compartment of his wallet. Finally, although Curtin attempted to defend his

---

[2] The commonsense nature of this testimony distinguishes it from the testimony at issue in the cases upon which Curtin relies. *See Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 484 (7th Cir. 2020) (finding an abuse of discretion where the district court excluded economic incentives testimony that required analysis of market conditions); *Lamarre*, 248 F.3d at 648 (affirming the defendant's conviction on harmless error review but concluding that the district court abused its discretion by excluding intellectual functioning testimony).

actions by claiming that he only sought to obtain information to turn in the abusive "father," the jury learned that Curtin never reported the abuse to authorities.

We consider the strength of this evidence against the potential effect of Dr. Saleh's testimony: very little. His expert report revealed that Curtin's lack of markers for pedophilic disorder carries minimal probative value; the absence of the disorder "does *not* negate the offense conduct as alleged." And his proposed testimony that sexual interest in adults does not evince sexual interest in minors reflects a commonsense proposition—one that came into the record by other evidence and arguments. The admission of Dr. Saleh's testimony thus would not have made the government's case significantly less persuasive. We find any errors in exclusion harmless.

*       *       *

The judgment of the district court is

AFFIRMED.